# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. 21-SC-891
)
**INFORMATION ASSOCIATED WITH ONE CELL PHONE ACCOUNT STORED AT** )
**PREMISES CONTROLLED BY AT&T CORPORATION PURSUANT TO 18 U.S.C. § 2703** )
**FOR INVESTIGATION OF VIOLATION(S) OF 18 U.S.C. §§ 111(a), 231(a), 1512(c), 1752(a),** )
**2101, and 40 U.S.C. § 5104(e)** )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

SEE ATTACHMENT A

located in the _____ District of _____ Texas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §111(a) | - Assaulting, Resisting, or Impeding Certain Officers or Employees |
| 18 U.S.C. § 231(a) | - Impeding Law Enforcement in Performance of Official Duties |
| 18 U.S.C. § 1512(c)(2) | - Obstruction of an Official Proceeding |
| 18 U.S.C. § 1752(a) | - Knowingly Entering and Remaining in Restricted Grounds to Disrupt Government Business |
| 18 U.S.C. § 2101 | - Interstate Travel with Intent to Riot |
| 40 U.S.C. § 5104(e) | - Violent Entry and Disorderly Conduct on Capitol Grounds |

The application is based on these facts:

SEE AFFIDAVIT

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent John McBrien, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means).*

Date: _____ 03/15/2021 _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____     Zia M. Faruqui, United States Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ❒ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  21-SC-891 |
| **INFORMATION ASSOCIATED WITH  ONE CELL PHONE ACCOUNT STORED AT** | ) | |
| **PREMISES CONTROLLED BY AT&T CORPORATION PURSUANT TO 18 U.S.C. §** | ) | |
| **2703 FOR INVESTIGATION OF VIOLATION(S) OF 18 U.S.C. §§ 111(a), 231(a), 1512(c),** | ) | |
| **1752(a), 2101, and 40 U.S.C. § 5104(e)** | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Texas _____
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

**YOU ARE COMMANDED** to execute this warrant on or before _____ March 28, 2021 _____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Zia M. Faruqui _____ .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*  ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:    03/15/2021 _____          _____
                                                                                            *Judge's signature*

City and state:    Washington, D.C. _____          Zia M. Faruqui, United States Magistrate Judge
                                                                                            *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-SC-891 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A
### Property to Be Searched

This warrant applies to records and information associated with the AT&T account(s) identified by 404-387-8578 (the "Account") and which is stored at premises owned, maintained, controlled, or operated by AT&T Corporation, a wireless telephone service provider headquartered in Dallas, Texas.

**ATTACHMENT B**
**Particular Things to Be Seized and**
**Procedures to Facilitate Execution of the Warrant**

**I.      Information to be Disclosed by the AT&T Corporation ("PROVIDER") to Facilitate Execution of the Warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to the Provider or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a.   The following information about the customers or subscribers of the Account:

        i.   Names (including subscriber names, user names, and screen names);

        ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.   Local and long distance telephone connection records;

        iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.   Length of service (including start date) and types of service used;

        vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. For the time period from December 23, 2020 through February 6, 2021: All records and other information relating to wire and electronic communications sent or received by the Account, including:

  i. Records of the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers ("call detail records"), email addresses, and IP addresses) including web browsing history and text messaging history;

  ii. Information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received; and,

  iii. Records and information regarding per-call measurement data (PCMD) (also known as Network Event Location Services (NELOS), Timing Delay/Timing Advance (TA), TrueCall, Time on Tower Report, and/or Real Time Tool (RTT) data).

c. For the time period from December 23, 2020 through February 6, 2021: The contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as voice call services, voice mail, text messaging,  SMS, instant messaging or chat services, or picture and imaging sharing services), including but not limited to incoming, outgoing, and draft calls, chats, messages, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication; the date, size,

2

and length of each communication; and any user or device identifiers linked to each communication (including cookies);

d. For the time period from December 23, 2020 through February 6, 2021: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as voice call services, instant messaging or chat services, or remote computing services), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as voicemail, text and SMS messages, contacts, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

e. All records pertaining to devices associated with the Account, including the names and phone numbers associated with other devices on the subscriber's plan, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

Special Agent John McBrien, jwmcbrien@fbi.gov.

3

This warrant authorizes a review of records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**II.      Information to be Seized by the Government**

1.        All information described above in Section I that constitutes evidence, instrumentalities, fruits, and contraband of the violations of Title 18 U.S.C. § 111(a)(1) (Assaulting a Federal Officer); 18 U.S.C. § 231(a)(3) and (2) (Civil Disorder); 18 U.S.C. § 1512(c)(2) (Obstruction of Congress); 18 U.S.C. § 1752(a)(1), (2), and (4) (Unlawful Entry on Restricted Buildings or Grounds); 18 U.S.C. § 2101 (Interstate Travel with Intent to Riot); 40 U.S.C. § 5104(e)(2)(A), (B), (C), (D), (F), and (G) (Violent Entry, Disorderly Conduct, and other Offenses on Capitol grounds) (collectively, the "Subject Offenses") as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

a.        Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

b.        Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

c.        Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

d.        Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

e.        Evidence relating to a conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

5

f.      Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

g.      Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

h.      Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

i.      Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

j.      Evidence of any conspiracy, planning, or preparation to commit those offenses;

k.      Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

l.      Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray or smoke grenades;

m.      Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.      Evidence of the state of mind of the subject and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

o.      Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

p.      Information that constitutes evidence concerning the riot that occurred at the U.S. Capitol on January 6, 2021;

q.      Information that constitutes evidence of any planning and preparation that the user of the account undertook prior to committing the criminal activity under investigation;

r.      Information that constitutes evidence of any steps that the user of the account took to disguise or hide their participation in the criminal activity under investigation;

s.      Information that constitutes evidence of the identification or location of the user(s) of the Account;

t.      Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account

7

about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

u.      Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner; and,

v.      The identity of any person(s) who communicated with the account about matters relating to the events of January 6, 2021, including records that help reveal their whereabouts.

**III.     Government Procedures for Warrant Execution**

The United States government will conduct a search of the information produced by PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE CELL PHONE ACCOUNT STORED AT PREMISES CONTROLLED BY AT&T CORPORATION PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION(S) OF 18 U.S.C. §§ 111(a), 231(a), 1512(c), 1752(a), 2101, and 40 U.S.C. § 5104(e)** | **Case No. 21-SC-891**<br><br>**Filed Under Seal** |

*Reference:*    *USAO Ref. # 2021R00162/2021R00460; Subject Account(s):*
            *Phone Number 404-387-8578*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, John McBrien, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for certain location and related information associated with one cellular telephone account with assigned phone number 404-387-8578 (the "SUBJECT PHONE NUMBER"), that is stored at premises controlled by AT&T Corporation ("PROVIDER"), a cellular service provider headquartered in Dallas, Texas.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

1

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2018. Prior to the FBI, I worked in private industry contracted to the United States government for over eight years on matters including counterterrorism and national security.

3.      I am presently assigned to the FBI, Atlanta Field Office, on the Joint Terrorism Task Force ("JTTF") in Chamblee, Georgia. In this capacity, I am responsible for the investigation of international terrorism and domestic terrorism activities. As part of these investigations, and others, I have participated in physical surveillance, worked with confidential human sources, conducted interviews, served subpoenas, and executed search, seizure, and arrest warrants.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that BRUNO JOSEPH CUA ("CUA") has violated Title 18, United States Code ("U.S.C.") Section ("§") 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers or Employees); Title 18 U.S.C. § 231(a)(3) (Civil Disorder); Title 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding); Title 18 U.S.C. § 1752(a)(1), (2), and (4) (Knowingly Entering and Remaining in Restricted Grounds to Disrupt Government Business); and Title 40 U.S.C. § 5104(e)(2)(A), (B), (C), (D), (F), and (G) (Violent Entry and Disorderly Conduct on Capitol Grounds) (collectively, the "Subject Offenses")[1].  CUA is still under investigation for

---

[1] The target of this investigation has been indicted on these charges. See U.S. v. Bruno Joseph Cua, 1:21-CR-107-RDM, Dkt. 7

violations of Title 18 U.S.C. § 2101 (Interstate Travel with Intent to Riot). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *Background*

7.      The U.S. Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 on January 6, 2021.

### *The 2020 United States Presidential Election and the Official Proceeding on January 6, 2021*

8.      The 2020 United States Presidential Election occurred on November 3, 2020.

9.      The United States Electoral College is a group required by the Constitution to form every four years for the sole purpose of electing the president and vice president, with each state appointing its own electors in a number equal to the size of that state's Congressional delegation.

10.     On December 14, 2020, the presidential electors of the U.S. Electoral College met in the state capital of each state and in the District of Columbia and formalized the result of the

3

2020 U.S. Presidential Election: Joseph R. Biden Jr. and Kamala D. Harris were declared to have won sufficient votes to be elected the next president and vice president of the United States.

11.     On or about December 19, 2020, President Donald J. Trump tweeted, "Statistically impossible to have lost the 2020 Election.  Big protest in D.C. on January 6th.  Be there, will be wild!"

12.     On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate ("the Joint Session") convened in the United States Capitol building (the "Capitol" or the "U.S. Capitol") to certify the vote of the Electoral College of the 2020 U.S. Presidential Election (the "Certification").

### Criminal Activity Before the Riot

13.     Based on my knowledge, training, and experience, I know that participants in the kinds of criminal activities described herein tend to, and often did here, take certain preparatory steps before committing their crimes, including: researching and purchasing materials and supplies such as burner phones, tactical vests and helmets, and weapons including bear spray, pepper spray, asps (police batons), guns and ammunition, and zip tie restraints; mapping and reconnoitering the location of the planned crime and possible entry and escape routes, including checking for surveillance cameras and other potential security surrounding such locations; training in how to use their weapons and other tools and techniques involved in their planned criminal activity; and organizing with other co-conspirators on social media and elsewhere for planned travel and methods of attack.

14.     Beginning in December 2020, using social media, text messaging, and messaging applications, subjects planning to participate in the riot sent incendiary messages aimed at

recruiting as large a following as possible to go to Washington, D.C. to interfere with the official Congressional proceeding on January 6, 2021.

15.     The investigation has shown that many of the subjects of this investigation came from out of state and coordinated using social media, text messaging, and messaging applications on their cell phones.  Using these tools, they coordinated their travel and other activities, including discussing what gear and weapons to bring and their plans to overrun the Capitol and take hostages.

16.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and helmets.  The common equipment and paraphernalia that groups inside and outside the Capitol possessed, such as bear spray, eye protection, tactical vests, and helmets, are evidence of some prior agreement among individuals to engage in the conduct described herein.

### The Riot at the U.S. Capitol on January 6, 2021

17.     At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

18.     The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

19.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

20.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on December 23, 2020.  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

21.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

22.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

23.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.

24.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

25.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

26.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



27.     Multiple groups that forcibly entered the Capitol appeared to consist of individuals who had practiced and/or coordinated their actions.  For example, some groups included members who dressed in similar uniforms with the same insignia, and members of some groups can be heard on video giving and following instructions.  Based on my training and experience, and this investigation, these groups' manner of dress, movements, and communication demonstrate that they had prepared together.  In addition, the equipment and paraphernalia that groups inside and outside the Capitol possessed, such as flex cuffs, bear spray, eye protection, and helmets, are evidence of some prior agreement among individuals to engage in the conduct described herein. Finally, the movement of these groups within the Capitol demonstrates an intent to, among other things, oppose by force Congress's authority and to prevent, hinder, or delay the execution of the Joint Session's legal responsibilities

28.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President

8

Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

29.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained.

30.     The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons and used them against law enforcement officers trying to protect the U.S. Capitol and the people who were legitimately inside it.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

31.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

32.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

33.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video on the news media website of The New Yorker shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



34.     After subjects forced entry into the Senate Chamber, the same publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



35.     A subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter on the same video, stated, "Its Only A Matter of Time Justice is Coming."



36.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

37.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

38.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

39.     At around 4:52 p.m. EST, at a staging area for the media set up outside of the U.S. Capitol building on the east side, unknown subjects assaulted members of the media and stole and destroyed equipment owned by various members of the media and media companies.

40.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

41.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

42.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

43.     Beginning around 9:00 p.m., the House resumed work on the Certification.

44.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

12

### *Cell Phone Usage at the Riot*

45.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.  Subjects also posted comments, pictures, and video before, during, and after breaching the Capitol grounds and the Capitol building.

46.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to coordinate with other participants at the gatherings, to communicate with other individuals about the gatherings, to allow individuals to capture photographs and video footage of the gatherings, and to post on social media and digital forums about the gatherings.

47.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

48.     Photos available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos.

49.     In addition, organized groups within the rioters used social media, text messaging, and messaging applications and other apps on their cell phones to plan and coordinate their activities before, during, and after the riot.

### *Criminal Activity After the Riot*

50.     Following the riot, many subjects posted pictures, video, and texts showing and describing their participation in the riot.  These included selfies and videos apparently taken with their personal cell phones.  Some subjects also posted plans for similar future activity, such as taking over state capitols.  Many of these posts were subsequently deleted.  In addition, according to records provided by Google, some people who were in or near the U.S. Capitol building during the riot subsequently deleted their Google location history or their Google accounts altogether after January 6, 2021.  I know from my knowledge, training, and experience that people who commit criminal acts will often delete such information in an attempt to thwart any subsequent criminal investigation.  Some subjects subsequently fled their homes and went into hiding.  Some also discussed this and hiding the gear that they used in the riot over text messages.

### *Facts Specific to This Application*

51.     Beginning on or about January 8, 2021, the FBI received at least two tips identifying BRUNO JOSEPH CUA ("CUA") as a participant in the January 6, 2021 riot at the U.S. Capitol.

52.     COMPLAINANT #1 ("C1"), a sworn Law Enforcement Officer ("LEO"), reported CUA to the FBI on or about January 11, 2021. C1 identified CUA in a photograph from a Washington, D.C. Metropolitan Police Department ("MPD") presentation titled, "PERSONS OF INTEREST IN UNREST-RELATED OFFENSES." C1 has had direct interactions with CUA,

14

including in-person, through C1's official duties as an LEO in the jurisdiction where CUA lives in Milton, Georgia.

53.     After a follow-up telephone interview with an FBI Agent on January 15, 2021, C1 provided a total of five screenshots/photographs to the FBI, including screenshots of the MPD presentation, and screenshots from CUA's Instagram account, @bruno_cua1776.

54.     C1 identified CUA facing away from the camera, wearing jeans and a dark sweatshirt, holding a jean jacket with tan lining in his left hand, and wearing a red baseball hat with the number "45" on the right side of it in the two screenshots of the MPD presentation. C1 also identified CUA wearing the same clothing—including the red hat with number "45" and the jean jacket with tan lining—in screenshots of two other undated Instagram posts from CUA's Instagram account.[2] CUA also appears to be similar height and build as the subject in MPD's presentation, and has the same hair color. CUA's jean jacket appears to be inside out in the two MPD presentation screenshots.

55.     In the screenshot of an Instagram story from CUA's Instagram account, CUA stated he "stormed" the Capitol and, along with unidentified others, "physically fought our way in." The screenshot was captured at 5:33 PM on January 6, 2021. FBI Agents reviewed the screenshot and

---

[2] In the Instagram photos provided by C1, CUA is wearing a dark sweatshirt with a logo on the back of the shirt that appears to be a red, white and blue flag over an eagle. In the MPD presentation and video from The New Yorker from the Senate Chamber on January 6, 2021, CUA is in a similar dark sweatshirt, but with the eagle logo on the front of the sweatshirt. FBI Agents reviewed and compared the screenshots, images, and videos of CUA wearing a sweatshirt. Based on the similarities of the sweatshirt colors and the sweatshirt logos seen separately on the front and back, FBI Agents believe that the sweatshirt is reversible or CUA wears at least two versions of the same sweatshirt; one with the logo on the front and one with the logo on the back. In some instances, the sweatshirt CUA is seen wearing looks brown; in other instances, the sweatshirt looks grey. Additionally, in some instances, the sweatshirt logo is on the front and in other instances the same logo is on the back.

determined CUA posted the Instagram story at approximately 5:13 PM on January 6, 2021, based

on an Instagram timestamp of "20m" meaning that the story was posted twenty minutes earlier.





56.     On January 17, 2021, The New Yorker published a video titled, "A Reporter's Video from Inside the Capitol Siege". The video documents individuals as they fought their way inside the U.S. Capitol on January 6, 2021, and shows those who made it all the way to the Senate floor.

57.     The video shows CUA in the Senate Gallery at a video timestamp of approximately 4:21. At a timestamp of approximately 4:27, CUA is seen in front of a marble wall wearing the dark sweatshirt red hat and holding the same jean jacket from screenshots provided by C1. CUA is also holding a cellular phone and appears to be actively filming. At a timestamp of

approximately 4:32, CUA is seen facing the camera, wearing the dark sweatshirt, holding the same jean jacket in his left hand, a red cellular phone in his right hand, while wearing grey gloves.







58.     In the same video at a timestamp of approximately 4:44, CUA is heard off camera stating, "They can steal an election, but we can't sit in their chairs?" In an in-person interview with FBI Agents on January 20, 2021, C1 identified CUA speaking in the video at the same timestamp.



59.     Shortly thereafter, in the same video at a timestamp of approximately 4:45, the camera pans to CUA standing in the back of the Senate Chamber. CUA is seen with his cellular phone in his right hand, the inside-out jean jacket in his left hand, wearing the red hat, and the dark sweatshirt. At this point in the video, the logo of an American flag in the shape of what appears to be an eagle is visible on CUA's sweatshirt.



60.     On January 20, 2021, FBI Agents conducted an in-person interview of C1. FBI Agents also interviewed WITNESS #1 ("W1") and WITNESS #2 ("W2"), both of whom are sworn LEOs. W1 and W2 positively identified CUA based on their direct and indirect interactions with CUA through their official duties as LEOs in the jurisdiction where CUA lives in Milton, Georgia.

61.     C1, W1, and W2 each reviewed the video from The New Yorker after its release on January 17, 2021. C1, W1, and W2 each independently identified CUA as speaking in the video at the same approximate timestamp of 4:44. W1 corroborated the identification of CUA in screenshots of CUA provided by C1. W2 also corroborated the identification of CUA in the same screenshots.

62.     In a separate video captured by U.S. Capitol Police ("USCP") closed circuit television ("CCTV") cameras of the events of January 6, 2021, CUA is seen outside the Senate Gallery near S309 at a video timestamp of approximately 0:04. CUA is seen wearing jeans, with the same previously identified jean jacket, dark sweatshirt, and red hat, while holding what appears to be a baton in his right hand and a cellular phone in his left hand.



63.    In the same video at an approximate timestamp of 0:16, CUA is seen outside the Senate Chamber doors, in a physical altercation with USCP plain clothes officers, still holding a baton in his hand. Specifically, CUA can be seen shoving a USCP Officer in front of the door to the Senate Chambers. CUA is then seen entering the Senate Chambers through the open door at an approximate timestamp of 0:27.







64.    In another USCP CCTV video from the East Corridor near S306, CUA is seen

walking down the corridor wearing the same jean jacket, grey gloves, dark sweatshirt, and red hat.

CUA is seen carrying what appears to be a baton in his right hand and a cellular phone in his left hand.



65.     During the same video, CUA is seen attempting to open a brown door at an approximate timestamp of 0:19. As he continues down the corridor, CUA is observed wearing the same previously identified attire, including the dark sweatshirt with logo, while twirling a baton in his right hand.





66.     On January 21, 2021, C1 provided the FBI with a photograph taken from a law enforcement encounter between a local law enforcement department and CUA on January 3, 2021, in the jurisdiction where CUA lives in Milton, Georgia. In the photograph, CUA is seen wearing the same jean jacket and grey gloves that he wears in The New Yorker video and in USCP CCTV videos.



67.     On or about January 8, 2021, the FBI received a tip identifying CUA's Parler account, @PatriotBruno with name Brunocua, along with posts from CUA's account. In some of the posts, CUA referenced plans to travel to Washington, D.C. on January 6, 2021. In other posts, CUA stated, "President Trump is calling us to FIGHT!" and "This isn't a joke, this is where and when we make our stand. #January6th, Washington DC." The tip also stated CUA "actively encouraged the events on the sixth for 11 days leading up to the domestic terrorist attack."



68.      On December 19, 2020, CUA posted a video titled "Fight for Trump" with an image

of "KAGWAR" on Instagram account bruno_cua. Based on my experience and training, I have

learned that "KAGWAR" stands for "Keep America Great" War.





69.     Publicly available information on CUA's Instagram account, bruno_cua, also revealed several other social media accounts, including CUA's Instagram account, bruno_cua1776.

28



70.     In a publicly available post on Instagram account bruno_cua, CUA posted about creating Parler account @Brunocua with name Brunocua on November 8, 2020. A screenshot of the account also included information for several other social media accounts: YouTube – Southern Adventures; Instagram – bruno_cua; and Tiktok – bruno_cua.

29



71.     In response to a search warrant issued in the U.S. District Court for District of Columbia, Facebook Inc. provided account information and content on and from CUA's Instagram accounts bruno_cua and bruno_cua1776. Based on a review of information provided by Facebook, Inc., CUA publicly posted comments on Instagram like "AN ARMY IS COMING TO D.C." and "that's the spirit then let's overthrow 90% of the government" as early as December 20, 2020. CUA also sent private messages telling other Instagram users of his intent to come to D.C. on January 6th, saying "we can storm the freaking senate/house." During testimony provided during CUA's Detention Hearing on February 10, 2021 and February 12, 2021, CUA's father, JOSEPH CUA, testified he, CUA, and CUA's mother traveled to Washington, D.C. together on January 5, 2021.

72.     As described above, there is evidence that CUA had in his possession a digital device while at the U.S. Capitol on January 6, 2021. Specifically, in several still shots from videos

30

reviewed of footage taken inside the Capitol January 6, 2021, CUA appears to be using a red cellphone. In addition, based on photos and videos of the offenses that date, numerous persons committing the Target Offenses possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses. Further, based on the investigation, numerous persons committing the Target Offenses possessed digital devices to communicate with other individuals to plan their attendance at the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

73.     Moreover, it is well-known that virtually all adults in the United States use mobile digital devices.  In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

74.     According to records obtained through a search warrant served on PROVIDER, on January 6, 2021, at or about the time of the incident described above, that is, at approximately 2:48 PM Eastern Standard Time, the cellphone associated with the SUBJECT PHONE NUMBER was identified as having used utilized a cell site consistent with providing service to a geographic area that includes the interior of the United States Capitol building.

75.     According to records provided by PROVIDER, the SUBJECT PHONE NUMBER is also associated with the following device identifiers: a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN") 404-387-8578, an International Mobile Subscriber Identifier ("IMSI") 310410233529144, and an International Mobile Equipment Identity ("IMEI") 3529021152449613.

76.     According to wireless subscriber information provided by the PROVIDER, ALISE CUA ("ALISE CUA"), the mother of CUA, with residence address 14745 Wood Road, Alpharetta, Georgia 30004, has been the subscriber for the SUBJECT PHONE NUMBER since December 23, 2020.

77.     According to records obtained through a search warrant served on Parler LLC, BRUNO CUA identified himself as the primary user of the SUBJECT PHONE NUMBER. In a January 10, 2021 post from CUA's Parler account PatriotBruno, CUA stated, "You can find me on telegram with my phone number 404-387-8578."

78.     According to records obtained through a search warrant served on Facebook, Inc., CUA listed the SUBJECT PHONE NUMBER in a post from his Instagram account, bruno_cua1776, on January 7, 2021:



**Seriously add my number, they're shutting down all communications this isn't a joke, maybe they'll shut phone lines down too**

**And more importantly, follow me on Parler. If you haven't yet now is the freaking time. GET ON PARLER**

**404-387-8578**

79.     According to records provided by Facebook Inc., the SUBJECT PHONE NUMBER was also listed as the phone number for BRUNO CUA's Instagram account bruno_cua.

80.     According to records provided by Apple Inc., the SUBJECT PHONE NUMBER was listed as the Facetime/iPhone phone number for BRUNO CUA with Apple ID brunocua@gmail.com.

81.     Based on my training and experience and the facts set forth above, I respectfully submit there is probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

82.     PROVIDER is the provider of the cell services for the SUBJECT PHONE NUMBERS.

83.     PROVIDER is a company that provides cellular telephone access to the general public.  As part of the provision of such access, PROVIDER gives its users a cell phone number, voice mail, cell service based text messaging, SMS messaging, the ability to share pictures and video, and cell service based access to the internet.  As part of its regular business practices, PROVIDER stores information about the use of these services and their contents for varying periods of time depending on the service.

84.     Wireless providers such as PROVIDER can provide cell service to more than one phone as part of a package, so that the SUBJECT PHONE NUMBER may be associated with other phones that are paid for by the same subscriber.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account and/or who may have conspired with the user of a particular PROVIDER account.

33

85.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including Media Access Control address ("MAC" address), an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that cell service providers like PROVIDER retain records of the unique identifiers of their subscribers' cell phones and other devices.

86.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

87.     Wireless providers such as PROVIDER typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.

34

88.     Wireless providers such as PROVIDER typically collect and retain information in their normal course of business about their subscribers' use of PROVIDER's services, including records about calls, text messages, SMS messages, pictures and video or other communications sent or received by a particular device, such as the source and destination telephone numbers ("call detail records"), email addresses, and IP addresses, and other transactional records.  These records may include the contents of such communications.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE NUMBER's user or users and who they communicated with and when.

89.     Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider typically stores: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

90.     I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers may

35

be a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

91.     Based on my training and experience, I know that PROVIDER also collects Per-Call Measurement Data ("PCMD").  PCMD estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.  This location information is variously known as "NELOS" (AT&T), "TrueCall" and "Time on Tower Report" (T-Mobile), "Timing Delay/Timing Advance" (T-Mobile & Sprint), and/or "Real Time Tool" (RTT) (Verizon) data.  Given the limits of the antenna compared to cell towers, this information is likely to be even less reliable than it is when collected by traditional cell towers.  AT&T's NELOS information can provide an approximate location of the cellular device using a combination of timing advance, Wi-Fi, and global positioning information (GPS).  At times, this information can supplement cell site data when no call or text information is available.

92.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications, as well as PROVIDER-generated information about its subscribers and their location and use of PROVIDER services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

36

93.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, text messages, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by PROVIDER can show how and when the account was accessed or used.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail).  Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation.   For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[3]

94.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or

---

[3] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because phones and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

95.     In my knowledge, training, and experience, I have learned that it is often beneficial to review at least 30 days of cell phone records on either side of a criminal event because they will establish a pattern of life and behavior.  A smaller collection of records would make it difficult to determine if it is unusual for the phone(s) to appear in the areas where these crime(s) occurred.  Not only will this assist in determining if the phone(s) frequents the areas of the crime scene(s), but also whether the phone normally belongs in these areas because that is where the phone subscriber lives and/or works.

## AUTHORIZATION REQUEST

96.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

97.     I further request that the Court direct PROVIDER to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

98.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.  I submit that Assistant U.S. Attorney Kimberly L. Paschall, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

99.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence of the Subject Offenses may be located with the records and information associated with the SUBJECT PHONE NUMBER described in Attachment A. Therefore, I request that the Court issue the proposed search warrant to seize items described in Attachment B.

Date: March 15, 2021                                     Respectfully submitted,

_____

John McBrien
Special Agent
Federal Bureau of Investigation

*Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on March 15, 2021.*

_____

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ (PROVIDER), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of _____. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      The process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here, the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____

Date                                                       Signature